WINTER, Circuit Judge,
concurring:
I concur in the judgment remanding for further findings.
The district court’s finding of a February 2007 group formation that required disclosure under Rule 13d — 5(b)(1) cannot be upheld for various reasons discussed infra. Particularly, it was based in part on a flawed analysis of the economic and legal role of cash-settled total-return equity swap agreements.
The court viewed the economic role of such swaps as an underhanded means of acquiring or facilitating access to CSX stock that could be used to gain control through a proxy fight or otherwise. In my view, without an agreement between the long and short parties permitting the long party ultimately to acquire the hedge stock or to control the short party’s voting of it, such swaps are not a means of indirectly facilitating a control transaction. Rather, they allow parties such as the Funds to profit from efforts to cause firms to institute new business policies increasing the value of a firm. If management changes the policies and the firm’s value increases, the Funds’ swap agreements will earn them a profit for their efforts. If management does not alter the policies, however, and a proxy fight or other control transaction becomes necessary, the swaps are of little value to parties such as the Funds. Absent an agreement such as that described above, such parties must then, as happened here, unwind the swaps and buy stock at the open market price, thus paying the costs of both the swaps and the stock.
The district court’s legal analysis concluded that the one role of such swaps was to avoid the disclosure requirements of Section 13(d) — no doubt true — and therefore violated Rule 13d-3. The legal conclusion, however, was also flawed, leaving unmentioned, inter alia, explicit legislation regarding swaps and Supreme Court decisions discussing statutory triggers involving “beneficial ownership” of a firm’s stock. That legislation and those decisions, as they stood at the time, foreclosed the conclusion reached by the district court. Finally, the recent Dodd-Frank bill and SEC response thereto make it clear that the district court’s analysis is not consistent with present law. Dodd-Frank Wall Street Reform Protection Act, Pub.L. No. 111-203, 124 Stat. 1376 (2010); Beneficial Ownership Reporting Requirements and Security Based Swaps, S.E.C. Release No. 64,087, 17 C.F.R. Part 240, 2011 WL 933460, at *2 (June 8, 2011).
I
In my view, cash-settled total-return equity swaps do not, without more, render the long party a “beneficial owner” of such shares with a potential disclosure obligation under Section 13(d). However, an agreement or understanding between the long and short parties to such a swap regarding the short party’s purchasing of such shares as a hedge, the short party’s selling of those shares to the long party upon the unwinding of the swap agreements, or the voting of such shares by the short parties renders the long party a *289 “beneficial owner” of shares purchased as a hedge by the short party.
My discussion of the basis of this conclusion will begin with an examination of aspects of the underlying statutory scheme and resultant caselaw not discussed by the district court. It will then turn to the application of relevant rules promulgated by the SEC.
a) The Statutory Scheme
Examination of the statutory scheme is particularly important in this matter, for two reasons. First, critical language used in Section 13(d) is used elsewhere in the 1934 Act, and some harmonization of interpretation is desirable, if not necessary. Second, in 2000 and 2010, Congress amended the 1934 Act with particular reference to security-based swaps in ways relevant to this case.
To reiterate, Section 13(d) requires disclosure of a variety of information[1] by single beneficial owners of more than 5 percent of a firm’s equity securities. It also requires similar disclosure by a group of beneficial owners, who own in the aggregate more than 5 percent of a firm’s shares, when a purpose of the group is to acquire, hold, or dispose of such securities. See 15 U.S.C. § 78m(d).
Some measure of certainty should be accorded to persons subject to Section 13(d)’s disclosure requirements. Investors benefit little from case by case, prolonged, expensive and repetitive litigation that weighs amorphous standards and circumstantial evidence regarding state of mind with disparate outcomes, particularly when the underlying information quickly loses its relevance because of ever-changing commercial environments. Even where a disclosure requirement seems less than fully comprehensive, knowledge of what need be disclosed and what need not at least leaves the market with some certainty as to the unknown.
In the present case, much certainty can be provided simply by following the language of Section 13(d). The language does not impose a general disclosure requirement that is triggered by an intent to obtain control or an equity position of influence within a particular company. Nor does it purport to require, as suggested by the district court, disclosure of all steps that might be part of a control transaction in the eyes of a court.[2] Rather, it specifies precise conduct constituting the disclosure trigger: the acquisition, alone or in coordination with others, of “beneficial ownership” of 5 percent of any “equity security” of a company. 15 U.S.C. § 78m(d)(l).
The term “beneficial owner[s] ... of any equity security” was not drawn from thin air in 1968. Id. It was already a familiar term from its use in Section 16, which was part of the original 1934 Act. Section 16 requires the reporting of purchases and sales, and disgorgement of profits from certain of those sales, by a defined group of insiders: directors, officers, and, importantly for my purposes, “beneficial own *290 er[s] of more than 10 percent of ... any equity security” of a firm. 15 U.S.C. § 78p(a)(l). In brief, such beneficial owners (and directors or officers) must register, disclose their purchases and sales, and disgorge to the firm profits they made in short-swing trades — i.e., from purchases and sales of the firm’s shares within six months of each other. 15 U.S.C. § 78p(a), (b).
The purpose of Section 16 is generally said to be to reveal transactions by insiders, so defined, and to prevent short-swing profit making based on non-public, material information, ie., insider trading. See, e.g., Foremost-McKesson, Inc. v. Provident Sec. Co., 423 U.S. 232, 243, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (describing the purpose of Section 16(b)); H.R. Rep. 73-1383, at 13, 24 (1934) (stating that Section 16(a) was motivated by a belief that “the most potent weapon against the abuse of inside information is full and prompt publicity” and by a desire “to give investors an idea of the purchases and sales by insiders which may in turn indicate their private opinion as to prospects of the company”).. Section 16 relies as fundamentally on the concept of beneficial ownership as does Section 13(d). Subsequent to court decisions that both rejected the SEC’s views and read Section 16 in a mechanical way, see Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), the SEC, in promulgating Rules 13d-3(a) and (b) stated that Section 13(d) and Section 16 had different purposes and the new rules were “not intended to affect interpretations of Section 16.” Adoption of Beneficial Ownership Disclosure Requirements, Securities Act Release No. 5808, Exchange Act Release No. 13,-291, 42 Fed.Reg. 12,342, 12,342-43 (Mar. 3, 1977).
However, in 1991, the SEC harmonized Section 16’s interpretation of beneficial ownership of 10 percent with the corresponding provisions (but for a 5 percent requirement) of Section 13(d). See Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, Investment Company Act Release No. 17,991, 56 Fed.Reg. 7242, 7244-45 (Feb. 21, 1991). By SEC rule, a “beneficial owner” under Section 16 was defined as “any person who is deemed a beneficial owner pursuant to section 13(d) of the [1934] Act.”[3]17 C.F.R. § 240.16a-l(a)(l). One effect of this rule was to apply Rules 13d-3(a) and (b) in interpreting Section 16, perhaps a less consequential step than it seems in the context of the present issues because no great conflicts of interpretation had arisen. A perhaps more significant step was to apply Rule 13d-5(b)(l), which defines a group, discussed infra, to Section 16 determinations of whether multiple holders of equity securities are in the aggregate a “beneficial owner” of 10 percent. Thus, SEC rules interpret the term “beneficial ownership” to be the same under Section 13(d) as under Section 16.
Even without Rule 16a-l(a)(l), the pertinent language of the two sections is identical, and harmonization of interpretation is normally necessary. See, e.g., Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (“The 1933 [Securities] Act, like every Act of Congress, should not be read as a series of *291 unrelated and isolated provisions. Only last Term we adhered to the ‘normal rule of statutory construction’ that ‘identical words used in different parts of the same act are intended to have the same meaning.’”) (quoting Dep’t of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)); 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 46:6 (7th ed. 2008). The provisions of Section 16 relating to beneficial ownership, and the caselaw under it, thus inform and cabin any interpretation of the meaning of beneficial ownership under Section 13(d).
The caselaw under Section 16 is particularly informative with regard to whether Section 13(d) is to be interpreted as giving decisive weight to a would-be acquirer’s intentions toward a target, as the district court did, or whether a more mechanical, conduct-based interpretation is appropriate. Although modern financial transactions have generated some close cases—e.g., Kern County Land Co. v. Occidental Petroleum Co., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) — the application of Section 16 is largely mechanical, that is, independent of the purposes or state of mind of parties to a transaction. See, e.g., Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320-21 (2d Cir.1998) (“Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition. Such is the price of easy administration.”) (internal quotation marks omitted). For example, disgorgement has not been required for a stock purchase and sale made by a board member on the same day the member resigned, when the resignation became effective before the execution of the transactions. Lewis v. Bradley, 599 F.Supp. 327, 330 (S.D.N.Y.1984) (“Bradley’s resignation was the first order of business; next, was the sale and delivery of the shares; and finally, the exercise of his option rights. That the sequence of events may have been deliberately designed is of no consequence.”); see also B.T. Babbitt, Inc. v. Lachner, 332 F.2d 255, 258 (2d Cir.1964) (“Since the interval between the purchase and the sale exceeded six months — if only by one day — any profit which Lachner may have made on the transaction is not recoverable under § 16(b).”).
For another and very pertinent example, Section 16 has been held to allow a 13.2 percent shareholder to avoid disgorgement of profits made on a sale of 9.96 percent of the shares made within six months of their purchase by strategic timing of the sales. Reliance Elec., 404 U.S. at 419-20, 92 S.Ct. 596. The shareholder first sold enough shares to reduce its holdings to 9.96 percent, just below the 10 percent threshold, and then sold the rest of its shares shortly thereafter. Id. at 420, 92 S.Ct. 596. The shareholder avoided disgorgement of the profits on the second sale even though the two sales “were effected pursuant to a single predetermined plan of disposition with the overall intent and purpose of avoiding Section 16(b) liability.”[4] Id. at 421, 92 S.Ct. 596 (internal quotation marks omitted).
In so holding the Supreme Court stated:
The history and purpose of § 16(b) have been exhaustively reviewed by federal courts on several occasions since its enactment in 1934. Those courts have rec *292 ognized that the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great. As one court observed:
In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect. Thus Congress did not reach every transaction in which an investor actually relies on inside information. A person avoids liability if he does not meet the statutory definition of an “insider,” or if he sells more than six months after purchase. Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to “avoid” liability is one permitted by the statute.
Id. at 422, 92 S.Ct. 596 (internal quotation marks and citations omitted). Given the Supreme Court’s direction to harmonize the interpretation of multiple statutory uses of identical language and SEC Rule 16a-l, the well-established approach of Section 16 governs the interpretation of “beneficial ownership of any equity security” in Section 13(d). 15 U.S.C. § 78m(d)(l).
A large measure of certainty is provided by this test’s mechanical attributes, but, as Reliance Electric noted with regard to Section 16, at a cost. 404 U.S. at 422, 92 S.Ct. 596. Application of the language of Section 13(d) leads to an inevitable over-breadth — requiring disclosure where no control or influence is intended by a holder of 5 percent of shares.
There is also an inevitable under-breadth, see id.- — not requiring disclosure of conduct that constitutes significant steps in an attempt to gain control but does not fall within the pertinent language. Without triggering any disclosure requirement, a potential acquirer can, for example, amass 4.9 percent of the target company’s shares. The potential acquirer may further make inquiry of some large shareholders with an eye to learning how many shares might be available for private purchases in the future and what price ranges are likely, so long as there is no implicit or explicit agreement to buy. Pantry Pride, Inc. v. Rooney, 598 F.Supp. 891, 900 (S.D.N.Y.1984) (“Section 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws.”). Such inquiries may cause — and be expected to cause— these other shareholders to keep or acquire more shares than they otherwise would, in anticipation of the potential acquirer deciding to make an acquisition.
The same potential acquirer may line up financing in anticipation of a large purchase of the target company’s shares in a short period of time. The potential acquirer can then form a group with other like-minded investors and coordinate future plans to buy the target company’s stock, again so long as the 5 percent ownership threshold is not yet reached. The group may then cross the threshold and acquire an unlimited amount of the company’s securities over a ten-day period before being *293 required to make disclosure.[5] So long as “the method used to ‘avoid’ [disclosure] is one permitted by the statute,” Reliance Elec., 404 U.S. at 422, 92 S.Ct. 596, it does not matter that a firm or group of firms employing that method consciously sought to avoid disclosure under Section 13(d). That result flows from the statutory language and is not for courts to alter. However, perhaps because of the way this case was argued, none of the pertinent authority established under Section 16 was discussed by the district court, which gave overwhelming weight to the Funds’ intent.
The district court also did not consider the fact that Congress has been well aware of legal issues involving swaps for years and has repeatedly passed legislation regarding them, all of which is specifically relevant to the issues in this case and generally relevant to the propriety of, or need for, courts’ adopting legal rules that Congress and the SEC have avoided. For example, as part of the 2000 amendments discussed infra, Congress exempted security-based swap agreements from the 1934 Act’s definition of a security. See infra note 6; Commodity Futures Modernization Act of 2000, Pub.L. No. 106-554, app. E, sec. 301 & 303, § 206B (amendment to the Gramm-Leaeh-Bliley Act, Pub.L. No. 106-102 (1999)), & § 3A (amendment to the 1934 Act), 114 Stat. 2763, 2763A-449 to-453 (codified at 15 U.S.C. §§ 78c-l, 78c note). In 2010, as part of the Dodd-Frank bill, Congress included security-based swaps in the 1934 Act’s definition of a *294 security. Dodd-Frank Wall Street Reform Protection Act § 761(a)(2).
However, neither exemption from, nor inclusion in, the definition of security affects the outcome here because Section 13(d) applies to securities issued by a target firm and the swap instruments in question were not issued by CSX. Nor do the legislative definitions explicitly resolve the issue of whether the long party to a cash-settled total-return equity-based swap agreement is the “beneficial owner” of referenced securities purchased as a hedge by the short party. I turn to that issue infra.
My point, nevertheless, is that Congress was well aware of the issues arising from security-based swaps. In fact, security-based swap agreements are a metaphoric Alsace-Lorraine in the conflicting claims of jurisdiction by the SEC and the Commodity Futures Trading Commission (“CFTC”) over securities futures products. See Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 1.02[5], at 48-49 (Michael Gettelman ed., 3d ed. 2008).
The 2000 legislation, in effect at the time of the district court’s opinion and the hearing of this appeal, included a moderately lengthy and detailed amendment to the 1934 Act broadly limiting the SEC’s regulatory authority over security-based swap agreements. See Commodity Futures Modernization Act of 2000 §§ 301 & 303. In particular, that amendment prohibited the SEC from “promulgating, interpreting, or enforcing rules; [ ] or issuing orders of general applicability” in a manner that “imposes or specifies reporting or record-keeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading with respect to any [cash-settled total-return equity swap.]”[6] 15 U.S.C. § 78c- *295 1(b)(2). This amendment contained exceptions to this prohibition with regard to the disclosure and disgorgement provisions of Section 16 that, inter alia, make it clear that a long party’s ownership of cash-settled total-return equity swaps was not to be calculated in determining beneficial ownership of 10 percent of equity shares.[7] See 15 U.S.C. § 78e-l (b)(3).
In 2010, the Dodd-Frank bill not only included security-based swaps in the definition of security but also amended the definition of beneficial owner contained in Section 13 of the SEA. The provision now states:
(o) BENEFICIAL OWNERSHIP.— For purposes of this section and section 16, a person shall be deemed to acquire beneficial ownership of an equity security based on the purchase or sale of a security-based swap, only to the extent that the Commission, by rule, determines after consultation with the prudential regulators and the Secretary of the Treasury, that the purchase or sale of the security-based swap, or class of security-based swap, provides incidents of ownership comparable to direct ownership of the equity security, and that it is necessary to achieve the purposes of this section that the purchase or sale of the security-based swaps, or class of security-based swap, be deemed the acquisition of beneficial ownership of the equity security.
Dodd-Frank Wall Street Reform Protection Act § 766(e). However, the SEC has not exercised its new authority to promulgate rules that specifically reference swaps. Rather, it has repromulgated Rule 13(d) — 3 on the ground that “[a]bsent rule-making under Section 13(o), [the amendment to Section 13(o) ] may be interpreted to render the beneficial ownership determinations made under Rule 13d-3 inapplicable to a person who purchases or sells a *296 security-based swap.” Beneficial Ownership Reporting Requirements and Security Based Swaps, 2011 WL 933460, at *2. The SEC’s fear appears to be that, given the prior Congressional bar to its regulating cash-settled total-return equity based swaps, Rule 13d-3 could not apply to such swaps before the amendment and needed repromulgation pursuant to that amendment if the Rule were ever to apply to such swaps.
Two matters of significance must be noted. First, if Rule 13d-3 did not apply to such swaps before the amendment, the district court was wrong in its legal analysis. Second, the repromulgated Rule makes no mention of security-based swaps and in the words of the amendment to Section 13(o) regulates them “only to the extent” that it applies as written.
b) Beneficial Ownership
I turn now to the issue of whether the Funds, as long parties to the cash-settled total-return equity swaps, are beneficial owners of referenced shares bought by short parties to hedge short positions in those swaps. The district court held that if a long party to such a swap would expect that the short party would hedge its position by purchasing shares, then the long party was a beneficial owner of those shares because it “had the power to influence” the purchase. CSX Corp., 562 F.Supp.2d at 546. The district court further found that the “only practical alternative” for the short parties to hedge was to purchase CSX shares. Id.
The fact that the purchasing of CSX shares was the “only practical alternative” for short parties to hedge, as found by the district court, is not a circumstance that differentiates the swaps here from cash-settled total-return equity swaps generally. Other hedging methods for short parties exist, but these methods are exceptional. Henry T.C. Hu & Bernard Black, The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership, 79 S. Cal. L.Rev. 811, 816, 837 (2006). Moreover, they also appear to involve derivatives, e.g., swaps, stock options, or stock futures, that may result in the purchasing of referenced shares as a hedge by other parties further down in the chain of transactions. Id. The existence of other hedging methods does not affect the analysis, therefore, because the arguments proffered by CSX and the district court are as applicable to these hedge shares as they are to a first short party’s purchase of hedge shares.
In any event, a short party’s purchasing of shares is the most practical and common method of hedging, and long parties will expect that it will be used, if not by the immediate short party, then by another down the line. As a result, the district court’s ruling renders the long party to virtually all cash-settled total-return equity swaps a “beneficial owner” of such swaps. Thus, my discussion of the legal meaning of “beneficial owner” will assume that long parties expect short parties to hedge by buying shares.
There appears to be no generally accepted or universal definition of the term “beneficial owner.” Like the term “fiduciary,” it is very context-dependent, suggesting no more perhaps than that a power — e.g., to vote shares — or an asset be used for the benefit of the “beneficial owner.” SEC v. Chenery Corp., 318 U.S. 80, 85-86, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (“But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obli *297 gations? And what are the consequences of his deviation from duty?”).[8]
In the present context, there are two SEC rules that apply: Rules 13d-3(a) and 13d-3(b). See 17 C.F.R. §§ 240.13d-3(a), -3(b). These Rules were in effect at the time of the district court’s decision and, as discussed supra, were repromulgated in 2011 pursuant to the Dodd-Frank amendment to Section 13.
1) Rule 13d-3(a)
SEC Rule 13d-3(a) defines beneficial owner and provides:
For the purposes of sections 13(d) and 13(g) of the [1934] Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
(2) Investment power which includes the power to dispose, or to direct the disposition of, such security.
17 C.F.R. § 240.13d-3(a).
To reiterate, the swap agreements in the instant case do not obligate short parties to purchase shares as a hedge, to sell such shares either at a particular time or to the long party, or to vote those shares as the long party desires. The issue here is whether, under Rule 13d-3(a), such swaps accord the long party investment or voting power over the hedge shares when the short party purchases referenced shares as a hedge.
A) Investment Power
CSX argues that it was “inevitable” that TCI’s swap counterparties would buy CSX shares to hedge their short swap positions and then would sell those shares when TCI closed out its swaps. Brief of Cross-Appellee at 42. TCI had, CSX concludes, “the economic ability to cause its short counterparties to buy and sell the CSX shares” and therefore had “investment power” over those shares. Id.
*298 CSX asserts that expectations based on the incentives of counterparties to buy and sell shares qualify, for the purposes of Rule 13d-3(a), as the power to “direct the disposition” of those shares. 17 C.F.R. § 240.13d-3(a)(2). I disagree.
Both literally and in the context of the term “beneficial ownership” and Section 13(d)’s concerns over control, this argument gives too much breadth to the term “direct the disposition of.” To “direct” something, or to “influence” it, even indirectly, one generally must have some measure of active control, and, in the context of Section 13(d) and swaps, that control must be exercisable in the interests of the long party. See Filing and Disclosure Requirements Relating to Beneficial Ownership, Securities Act Release No. 5925, Exchange Act Release No. 14,692, Investment Company Act Release No. 10,213, 43 FecLReg. 18,484, 18,489 (Apr. 28, 1978) (Section 13(d) disclosure is required from any person who has the “ability to change or influence control”); Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114, 46 Fed.Reg. 48,147 n. 17 (Oct. 1, 1981) (beneficial ownership under Section 13(d) “emphasizes the ability to control or influence the voting or disposition of the securities”).
“Influence” must also be interpreted in the context of Section 13(d)’s concern over control transactions. No one would dream that the author of a weekly column providing stock tips that reliably cause investors to buy and sell the stocks mentioned was the beneficial owner of the shares bought and sold even though the column “influence[d],” not to say caused, the purchases and sales.[9] A relationship that leaves *299 short parties free to act in whatever way they deem to be in their self-interest with regard to purchases and sales of referenced shares also does not fit within the concept of “beneficial ownership” in the long party. Likewise, a swap agreement that accords complete freedom to the short parties to act in their self-interest with regard to purchases and sales of referenced shares does not confer “beneficial ownership” in the long party in any sense in which those words are commonly used.
Rather, without an agreement or understanding with regard to hedging or unwinding, cash-settled total-return equity swaps leave the short counterparty free to act solely in its self-interest. Absent an agreement or informal understanding committing the banks to buy shares to hedge their CSX-referenced swaps or to sell those shares to the long party when the swaps terminated, the Funds possessed only the power to predict with some confidence the purchase of those shares as a hedge, not the power to direct such a purchase, much less to direct those shares’ disposition. The long counterparties’ act of entering into a swap, therefore, falls well short of “directing” the short counter-parties to purchase the stock.
Long counterparties may well expect short counterparties to hedge their swap positions by buying the shares involved in an amount roughly equal to those specified in the swap. However, as noted supra, alternative hedging methods exist and are sometimes used. See, e.g., Caiola v. Citibank, N.A., 295 F.3d 312, 315-18 (2d Cir. 2002); Hu & Black, 79 S. Cal. L.Rev. at 816, 837. As noted, see Note 9, supra, these alternative methods may lead to a third party, whose identity is unknown to the long-party, buying hedge shares. Had the banks chosen, for whatever reason, not to hedge their short swap positions with a purchase of shares, not to sell all their hedge shares once the swaps had terminated, to alter their hedging methods and sell the hedge shares before the swaps were unwound, or to sell those shares to a competing would-be acquirer of CSX, the Funds would have lacked any means, legal or moral, to compel the banks to alter that choice or even to inform the Funds of their actions. See Hu & Black, 79 S. Cal. L.Rev. at 839. Thus, the sort of power that CSX attributes to the Funds does not fit within the language “to direct the disposition” of the CSX shares. 17 C.F.R. § 240.13d-3(a)(2).
CSX recognizes the need to establish a nexus between influencing a sale of the short party’s hedge shares upon unwinding and the long party’s control ambitions by arguing that, in the inducing of those sales, the Funds exercised investment power by “materially facilitat[ing] [the Funds’] rapid and low-cost acquisition of a physical position upon the termination of the swaps.” Brief of Cross-Appellee at 43. Whether or not the alleged “material facilitation” would run afoul of the Reliance Electric test, see supra, or would provide a sufficient nexus to the term “investment power” to constitute “beneficial ownership,” 17 C.F.R. § 240.13d-3(a)(2), the “material facilitation” claimed here substantially overstates the effect of acquiring long positions in cash-settled equity swaps.
Cash-settled equity swaps allow the short party to retain its hedge shares or dispose of them at the highest price available. Thus, the long party’s choices for acquiring actual shares in the referenced company are either to go into the open *300 market or to pay the short party no less than the open market price.
Buying or selling by the short party may affect the availability and price of shares, but hardly constitutes the claimed “material facilitation.”[10] If the market for the shares is liquid, as will often be the case, then rapid acquisition of those shares would be possible regardless of the sale of shares used to hedge swap positions. Thus, such a sale would have little practical effect on the long party’s ability to acquire shares. If the market is highly illiquid, then potential short parties would find it very costly to acquire the shares and thus either would not acquire shares to hedge their short swap positions or, more likely, would refuse to enter into such swap agreements.[11]
If the market’s illiquidity is more moderate, then closing out swap agreements may provide a degree of confidence that a block of shares will go on the market. However, purchasing this confidence will be very expensive, because keeping individual short parties under Section 13(d)’s 5 percent threshold may require using several short counterparties, who will be competing with each other for limited available shares and will pass the resulting increased hedging costs on to the prospecfive long party. Moreover, if the long party’s purpose is to ensure the availability of shares when making its acquisition move, the ultimate effect of these swap stratagems may be only to reduce market illiquidity for a competing acquirer — perhaps an acquirer that is in league with the firm’s management or even management itself — who, having avoided the costs of the swaps, will be better positioned to make its own bid.
Moreover, cash-settled total-return equity swaps will not lower a long party’s costs of acquisition. The basis for CSX’s claim that these swaps allow long parties to acquire shares at a low price is unclear. It may be based on the belief that unwinding the swaps will momentarily increase the market supply of shares and thus lower those shares’ market price. However, if the swap unwinding is likely to lower the prices of the referenced shares, then the short party, who, as a seller, will suffer from.that downward slippage in prices, will insist on passing those foreseeable extra hedging costs along to the long party in the form of higher “interest” payments, leaving long parties on the average in much the same (or worse) economic position as if they had simply bought the *301 shares directly, without a detour through a cash-settled equity swap position. In other words, cash-settled total-return equity swaps, without more, are not a substitute for the ownership of shares by parties seeking to control a corporation. Control still requires the purchase of shares on the open market, as happened in the instant case, or from the short party at the open market price, thus causing the party seeking control to bear the costs of both the swaps and the shares.
In the absence of some other agreement governing the disposition of shares purchased to hedge a swap position, merely having a long position in a cash-settled total-return equity swap does not constitute having the power, directly or indirectly, to direct the disposition of shares that a counterparty purchases to hedge its swap positions, and thus does not constitute having “investment power” for purposes of Rule 13d-3(a). 17 C.F.R. § 240.13d-3 (a)(2).
B) Voting Power
The district court found no evidence of explicit agreements between TCI and the banks committing the banks to vote their shares in a specified way. CSX Corp., 562 F.Supp.2d at 543. Nevertheless, CSX argues that TCI’s ability to select counter-parties gave it “voting power,” 17 C.F.R. § 240.13d—3(a)(1), over the counterparties’ hedge shares.
In fact, TCI eventually consolidated its swap holdings in Citibank and Deutsche Bank. TCI “hope[d] that Deutsche Bank would vote in [TCI’s] favor” because a hedge fund internal to Deutsche Bank, Austin Friars, also had investments in CSX. Brief of Cross-Appellee at 45-56. CSX argues further that when TCI chose its other swap counterparties, it selected banks that it knew were “sympathetic to [its] voting objectives.” Id. at 46 n. 26. CSX concedes that some of these counter-parties had policies that prohibited them from voting their shares but argues that the effective removal of these counterparties’ shares from the voting pool left TCI in a better position than if the votes of those shares had been left to chance. I disagree on both counts.
That a short party’s self-interest predisposes it to vote in favor of positions taken by a prospective long counterparty is insufficient, on its own, to show a transfer of voting power to the long counterparty for purposes of Section 13(d) and Rule 13d-3(a)(1). To hold otherwise would distort both the term “beneficial owner” and the word “power.” A short party’s self-interest is not an obligation to vote as the long party would desire. Nor is it a right in the long party to compel the short party to vote in a particular way.[12] Indeed, were another putative acquirer to appear in competition with the long party, the long party might well find that the short party’s self-interest was now at odds with its own. See Hu & Black, 79 S. Cal. L.Rev. at 839.
Purchases by a short party with a policy against voting shares held solely as a hedge will not increase the voting power of a long party’s shares. Abstaining can have influence only with regard to shares that, if not purchased by a short party as a hedge, would have been voted against the wishes of the long party. Because the hypothetical voting intentions of persons from whom the abstaining short parties purchased their shares on the open market are unknown, this asserted influence over *302 shareholder votes is entirely speculative and hardly qualifies as voting “power.”
The facts that the Funds “hoped” that Deutsche Bank would vote in the desired way, or that the Funds entered into cash-settled equity swap agreements with counterparties believed to be inclined to vote as the Funds desired, do not constitute the requisite power to direct the counterparties’ vote. See 17 C.F.R. § 240.13d-3(a)(1). Indeed, the facts indicate the opposite: when TCI realized that it needed to exercise control and decided to wage a proxy battle, it started unwinding its swaps and buying shares in order to vote the shares as it pleased, indicating that the Funds’ swap positions did not give the power, directly or indirectly, to “direct the voting” of the counterparties’ CSX shares. Id.
Finally, I note that my conclusion parallels Congress’s earlier decision to exclude security-based swaps in determining whether a party is a 10 percent beneficial owner, for purposes of Section 16, triggering its reporting and disgorgement provisions, while requiring 10 percent owners to report security-based swap holdings and to disgorge short-swing profits in trading them. See supra note 7.
2) Rule 13d-3(b)
While Rule 13d-3(a) sets forth the criteria for beneficial ownership of a security, Rule 13d-3(b) sets forth criteria for being “deemed” such a beneficial owner:
Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [sic] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the [1934] Act shall be deemed for purposes of such sections to be the beneficial owner of such security.
17 C.F.R. § 240.13d-3(b).
Rule 13d — 3(b) is one of a large number of historical and contemporary rules and regulations, or preliminary notes to them, that seek to prohibit “plan[s] or scheme[s] to evade” statutory provisions or SEC rules and regulations.[13] The purpose of *303 such “evasion provisions” is to effectuate statutory policies where SEC rules or regulations may not literally cover an unforeseen structure of a transaction or the creation of unforeseen instruments that fall within the regulated area but outside the literal terms of the pertinent regulatory provisions.
Evasion provisions are catch-all methods of closing unforeseen “loopholes” that seek to use form to evade substance or to comply with technicalities while violating the “spirit” or intent of regulatory provisions. As such, there are two important points to be made about them. First, evasion provisions do not expand the permissibly regulable area. Second, they are not subject to the canon of construction that a statutory or regulatory provision must be read to have effect and is not superfluous. New York State Restaurant Ass’n v. New York City Bd. of Health, 556 F.3d 114, 130 n. 17 (2d Cir.2009) (quoting APWU v. Potter, 343 F.3d 619, 626 (2d Cir.2003)) (“A basic tenet of statutory construction, equally applicable to regulatory construction, is that a text should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.”) Evasion provisions may be superfluous in actual practice because there are no loopholes.
There is no contention that the Funds’ cash-settled total-return equity swap arrangements had the purpose or effect of “divesting,” 17 C.F.R. § 240.13d-3(b), TCI of beneficial ownership of the CSX shares that TCI’s counterparties purchased. Therefore, the issue under Rule 13d-3(b) is whether those swap arrangements had the purpose or effect of “preventing the vesting,” id., of beneficial ownership in the short parties’ hedge shares.
Rule 13d-3(b) must be read in the context of both Section 13(d), which provides the underlying authority for the Rule’s promulgation, and of Section 16, as discussed at length supra. As that discussion indicated, a person or group triggers obligations under Sections 13 and 16 by conduct.
At one end of a spectrum of relevant conduct raising Section 13(d) issues, a party, or parties to a group, may decide to take steps toward the acquisition of a company. As noted above, they may plan to buy a significant block of shares well in excess of 5 percent. They may buy 4.9 percent of the company’s shares but stop there solely to avoid disclosure. They may arrange financing[14] and make preliminary *304 inquiries of large shareholders that may facilitate the rapid acquisition of shares once the desired moment to strike has arrived and before the ten-day disclosure period has expired. None of this triggers Section 13(d) disclosure until ten days after the 5 percent threshold has been passed, despite being steps in pursuit of an acquisition and fully designed literally to prevent the vesting of ownership of 5 percent in order to avoid disclosure.
At the other end of the spectrum, a party or group contemplating acquisition of a company may provide funds to another party or parties to buy shares with the understanding that the buyer(s) will retain them in the buyer’s name, to be conveyed to the would-be acquirer when so directed and without the nominal buyer(s) bearing any risk. Whether or not various aspects of such a transaction would be legally enforceable, such a sham would trigger the disclosure requirements of Section 13(d) if the shares held by the parties in the aggregate exceeded 5 percent. In this example, the understanding between the parties places the ostensible seller comfortably within the meaning of the term “beneficial owner,” because the buyer has obligated itself to retain the shares in order to re-convey them to the seller. (The underlying contract would also make the party behind the scheme part of a “group” with the buyer, as discussed infra.) In my view, the Funds’ cash-settled equity swap agreements with the banks fall closer to the first hypothetical on the spectrum for purposes of Section 13(d).
Again, for the Funds to be “deemed” a beneficial owner under Rule 13d — 3(b) there must be evidence both that their purpose in entering the CSX-referenced swap agreements was to “prevent” the vesting of beneficial ownership and that the intended prevention was part of a plan or scheme to “evade,” 17 C.F.R. § 240.13d-3(b), the Section 13(d) disclosure requirements.
The district court found “overwhelming” evidence that the Funds entered into the swap agreements “at least in major part, for the purpose of preventing the vesting of beneficial ownership of CSX shares in TCI and as part of a plan or scheme to evade the reporting requirements of Section 13(d).... ” CSX Corp., 562 F.Supp.2d at 548-49. The district court rested this conclusion upon the following evidence: (i) TCI’s chief financial officer once said that a reason to use swaps is that they provide “the ability to purchase without disclosure”; (ii) TCI emails had discussed the need to limit the size of swap agreements with individual counterparties in order to avoid those counterparties’ having to disclose their holdings of shares purchased for hedging purposes;[15] (iii) TCI acquired only 4.5 percent of CSX’s shares — below Section 13(d)’s 5 percent reporting threshold — until TCI was ready to disclose its position; and (iv) TCI admitted that one of its motivations for avoiding disclosure by its swap counterparties was a concern that disclosure would drive up the market price of CSX shares and thus increase TCI’s *305 cost of purchasing CSX shares later. Id. at 549.
Conduct violating Rule 13d-3(b) must also include a plan or scheme to “evade” the Section 13(d) reporting requirements. 17 C.F.R. § 240.13d-3(b). The district court concluded that TCI’s purchases were part of such a plan or scheme to evade. CSX Corp., 562 F.Supp.2d at 549. It stated that “no one suggests that TCI did nothing more than enter into an equity swap,” and that “[a]t a minimum, it entered into the [cash-settled total-return equity swap agreements] rather than buying stock for the purpose, perhaps among others, of avoiding the disclosure requirements of Section 13(d) by preventing the vesting of beneficial ownership in TCI.” Id. at 550 (internal quotation marks omitted).
This view of “evasion” under Rule 13d-3(b) is extraordinarily expansive. To be sure, TCI wanted to avoid disclosure and constrained its trading activities accordingly. In fact, the intent to avoid disclosure under Section 13(d) is ubiquitous. Quite apart from wanting to conceal acquisition tactics, a desire to avoid the expense of disclosure is inevitable. But “preventing” the vesting of beneficial ownership in shares must mean more than what the district court described. At a minimum, the transaction must include a component that provides a substantial equivalence of the rights of ownership relevant to control, or include steps that stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner. Conduct lacking such a component or steps does not violate the statute even when fully intended to avoid disclosure. Reliance Elec., 404 U.S. at 422, 92 S.Ct. 596 (“Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b).”).
The district court’s rationale depended so heavily on the Funds’ intent to avoid disclosure that it found it unnecessary to decide whether cash-settled total-return equity swaps constituted the equivalence of beneficial ownership of shares absent a desire not to disclose. CSX Corp., 562 F.Supp.2d at 545-48. (The district court strongly implied that it did.) It simply held that such swaps prevented the vesting of beneficial ownership — a characteristic common to all non-purchasing acts — and was intended to avoid disclosure — an ever-present state of mind. Id. at 551-52. The intent to avoid disclosure cannot constitute a violation of the statute when the underlying transaction does not provide the party with the substantial equivalence of the rights of ownership relevant to control. That is clearly the meaning of Reliance Electric.
I am aware of no SEC guidance establishing the meaning of “evade” in Rule 13-3(b), nor has our caselaw addressed the issue. In applying evasion provisions, the Commission appears to borrow doctrine from the tax evasion context, in particular, the business purpose and substance over form doctrines. See generally Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) (holding that when the form of a transaction does not comport with its substance, the substance of the transaction controls for tax liability purposes). For example, in what is perhaps its earliest interpretive guidance, the Commission suggested that a transaction would be interpreted as an attempt to evade registration requirements under the Act if it was not deemed “bona fide,” even if it “might comply with the literal conditions of [the Act].” Letters of General Counsel Discussing Application of Section 3(a)(9), Securities Act Release No. 646, 1936 WL *306 31995, at *2 (Feb. 3, 1936) (citing Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935)).
Similar analyses can also be seen in more recent Commission statements. For example, in a 1995 release concerning Regulation S, the Commission stated that the pertinent evasion provision would preclude an exemption under Regulation S where factors indicated that “the economic or investment risk never shifted to the offshore purchaser, and that the securities— as a matter of substance as opposed to form — never left the United States.... ” Problematic Practices Under Regulation S, Securities Act Release No. 7190, 60 Fed. Reg. 35,663, 35,664 (Jul. 10, 1995). In a 2002 adjudication, the Commission stated that “Regulation S shelters only bona fide overseas transactions; it is not a haven for any foreign stock distribution that is part of a plan to evade the registration provisions of the Securities Act.” In re Weeks, Initial Decision Release No. 199, 2002 WL 169185, at *34 (Feb. 4, 2002) (emphasis in original), affd, In re Hesterman, Securities Act Release No. 8139, Exchange Act Release No. 46,703, 2002 WL 31374801 (Oct. 22, 2002). Similarly, in addressing the applicability of the evasion provision under Rule 144A, the Commission stated that the provision applies when “the substance of a transaction is contrary to the Rule even though the transaction is structured so as to comply with the Rule’s technical requirements, such as when the transaction is a sham designed to create the illusion that it should be exempt.” Letter from Jacob H. Stillman, Solicitor, Office of the Gen. Counsel of the SEC, to Hon. Karon O. Bowdre, U.S. Dist. Court for the N. Dist. of Ala. (Nov. 28, 2006), In re Healthsowth Sec. Litig., No. CV-03BE-1500-S (N.D.Ala.), at 8.
In sum, as pertinent to the instant matter, evasion provisions may apply where a transaction, while in technical compliance with a rule, still evades its underlying policies. For example, the SEC staff has stated that “it does not seem to us to be necessarily sinister to [avail oneself] of a valid registration exemption ... so long as the public policy ... as expressed in the Act is not frustrated.” Hamelly Indus., SEC No-Action Letter, 1976 WL 10536, at *3 (Nov. 29,1976).
Evasion provisions must be read in light of the underlying statutory or regulatory provision. As explained above, there are many perfectly legal methods of intentionally avoiding disclosure under Section 13(d). Section 13(d) is designed to compel disclosure of holdings involving 5 percent beneficial ownership interests. It does not require disclosure of control ambitions absent such holdings. In that light, “evasion” suggests a transaction with the ownership characteristics and benefits intended to be regulated, or steps to create a false appearance of the transaction or the persons entering into it,[16] to avoid compliance with the regulation’s reporting requirements. See Letter from Brian V. Breheny, Deputy Dir., SEC Div. of Corp. Fin., as Amicus Curiae to Hon. Lewis A. Kaplan, U.S. Dist. Court for the S. Dist. of N.Y. (June 4, 2008), CSX Corp. v. The Children’s Inv. Fund Mgmt, L.L.P., et al, Doc. No. 08-cv-2764, at 3.
If the transaction under scrutiny does not have substantially the characteristics or expected benefits that are intended to be regulated, then an evasion provision simply does not apply. Evasion of Section 13(d), 15 U.S.C. § 78m(d), is not present in *307 cash-settled total-return equity swaps because the swaps themselves provide no means of exercising control. As explained in the discussion of Rule 13d-3(a), an owner of such swaps cannot seek to exercise control without buying the actual shares in an open competitive market. In the present case, when the Funds could not persuade CSX to change its policies, they had to make actual purchases of CSX stock, a step that would have been unnecessary if the swaps they held were the substantial equivalent of beneficial ownership.
It is also critical to note that the swaps here were not sham transactions creating a false appearance while lacking economic substance. Long counterparties to such swaps have legitimate economic purposes. As the district court found with regard to TCI, the swaps would enable TCI to reap a leverage-amplified profit if CSX’s management, faced with the Funds’ potential challenge, instituted new policies that increased the value of the company. CSX Corp., 562 F.Supp.2d at 522, 527. If that occurred, a successful insurgent proxy fight or other control transaction would have been precluded, but TCI would share in the increased value resulting from its efforts. Similarly, if competing bidders appeared with a higher price for the company, TCI would share in the increased share price.
Finally, my view does no substantial damage to underlying statutory policies; indeed, it effectuates them. As noted, swaps are not instruments that have escaped Congress’s attention and are a poor candidate for being labeled an unforseen device used to evade congressional purpose.
To the contrary, at the time of the district court’s decision, the 2000 Act not only exempted security-based swaps from the securities laws definition of a regulable “security” but also “prohibited” the SEC from regulating security-based swaps in the extraordinarily broad language quoted supra. See supra note 6. Congress’s then perception of a lack of an equivalence between cash-settled total-return swaps and ownership of the underlying securities was further demonstrated by Section 16’s exclusion of such swaps from the calculation of the 10 percent disgorgement trigger but inclusion in the calculation of profits from short-swing trades. That scheme recognizes that ownership rights do not attach to swaps and therefore such swaps cannot afford access to inside information. See supra note 7. Given that by statute swaps could not then be counted in calculating Section 16’s disgorgement trigger for the long party, it was a bold step indeed for the district court to hold that shares purchased and owned by the short party as a hedge were to be counted as owned by the long party because swaps “evade” the statutory purpose.
The situation is not much different today. While the SEC now has authority to regulate security-based swaps, it has simply repromulgated Rule 13d-3. For the reasons stated, this hardly justifies a court treating cash-settled total-return swaps as an evasion of Section 13(d).
c) “Group” Formation
I turn now to the issue of group formation, which governs the determination of which of the many participants in the events described above may be subject to Section 13(d)’s disclosure requirements.
Rule 13d-5(b)(l) provides that the Section 13(d) disclosure requirements apply to the aggregate holdings of any “group” formed “for the purpose of acquiring, holding, voting or disposing” of those securities. 17 C.F.R. § 240.13d — 5(b)(1).
Many of the concerns about the use of swaps to avoid Section 13(d)’s disclosure *308 requirements are allayed by the group concept. Any agreement or understanding between various funds for the purposes set out in Rule 13d — 5(b)(1) would cause the aggregation of shares beneficially owned by each member of the group for purposes of Section 13(d). Also, any agreement or understanding between long and short swap parties regarding: (i) the purchase of shares by the short party as a hedge; (ii) the sale of such shares to the long party when the swaps are unwound (as in settled-in-kind equity swaps); or (iii) the voting of such shares purchased by the short party, would cause the shares purchased as a hedge and any shares owned by the long party to be aggregated and counted in determining the 5 percent trigger. (Of course, as discussed supra, such an understanding might also render the long party a “beneficial owner” under Rule 13d-3(a). See 17 C.F.R. § 240.13d-3 (a).)[17]
With respect to whether there was such an agreement or understanding between the Funds, the district court found that TCI and 3G formed a group with respect to CSX securities no later than February 13, 2007. CSX Corp., 562 F.Supp.2d at 555.[18]
*309 As noted by my colleagues, the district court enumerated the circumstances, “including the existing relationship, the admitted exchanges of views and information regarding CSX, 3G’s striking patterns of share purchases immediately following meetings with [TCI officials], and the parallel proxy fight preparations” that persuaded it to find that TCI and 3G had formed a group by February 13, 2007. Id. at 553-55.
The district court’s finding as to the formation of a group between TCI and 3G in February 2007 cannot be upheld without adopting the district court’s legal conclusions regarding swaps. It was necessarily based in part on the premise that TCI’s purchase of swaps rendered TCI a beneficial owner of shares bought by the short parties as a hedge. It was that premise that led the court to conclude that TCI’s goal in February 2007 was at that time to seek control of CSX through the use of swaps. Indeed, on February 13, 2007, TCI and 3G did not own in the aggregate 5% of CSX’s actual shares.
The district court’s finding of a group also suffers from a second error. That finding was that “the parties activities from at least as early as February 13, 2007, were products of concerted action.” Id. However, Rule 13d-5(b)(l) applies only to groups formed “for the purpose of acquiring, holding, voting or disposing” of “securities” of the target firm. The Rule does not encompass all “concerted action” with an aim to change a target firm’s policies even while retaining an option to wage a proxy fight or engage in some other control transaction at a later time. Indeed, the Rule does not encompass “concerted action” with a change of control aim that does not involve one or more of the specified acts.
The overwhelming evidence is that TCI, while understanding that a hostile proxy fight might ultimately be necessary, first sought to change CSX’s policies without a control change and to profit through swaps. In fact, TCI was negotiating with CSX management at the end of March, and the strongest evidence relied upon by the district court in support of the TCI-3G group finding was the “parallel proxy fight preparations,” which occurred in “late September-October 2007.” CSX Corp., 562 F.Supp.2d at 553-54. The finding of a group formation in February 2007 is, therefore, flawed.
There are only two pieces of evidence supporting the February 2007 finding. One is the fact of the relationship between TCI and 3G — a 3G affiliate was an investor in TCI. The other is that, on two occasions, 3G purchased shares after conversations with TCI. These are the only concrete acts relied upon by the district court that might reflect a February 2007 agreement requiring aggregation of TCI/3G shareholdings.
As to the ongoing relationship between TCI and 3G, it surely demonstrates an opportunity to form a “group,” but it also provides an explanation for frequent conversations that do not involve CSX. With regard to 3G’s purchases of stock, there is no claim that TCI increased its shareholdings at the same time, that is, no evidence of “concerted action” in buying actual shares. In fact, there is no evidence whatsoever that 3G’s and TCI’s purchases of CSX stock were coordinated in February 2007. Indeed, the district court found that, at this time, TCI was informing other funds of TCI’s interest in altering CSX’s business plans in the hope of “steerfing] CSX shares into the hands of like-minded associates.” CSX Corp., 562 F.Supp.2d at 553. There is no evidence that 3G’s purchases at this time were more than the result of this sharing of information, which *310 hardly amounts to an agreement to buy CSX shares.
The finding of a “group” owning 5% of CSX shares in February 2007 is clearly erroneous, and I concur in order to seek clarification on a remand.
CONCLUSION
I therefore concur in the result. I add a final word, a relief to any reader who got this far. The issue here is not fact specific. Total-return cash-settled swap agreements can be expected to cause some party to purchase the referenced shares as a hedge. No one questions that any understanding between long and short parties regarding the purchase, sale, retention, or voting of shares renders them a group— including the long party — deemed to be the beneficial owner of the referenced shares purchased as a hedge and any other shares held by the group. Whether, absent any such understanding, total-return cash-settled swaps render a long party the beneficial owner of referenced shares bought as a hedge by the immediate short party or some other party down the line is a question of law not fact. At the time of the district court opinion, the SEC had no authority to regulate such “understanding”-free swaps. It has such authority now, but it has simply repromulgated the earlier regulations. These regulations, and the SEC’s repromulgation of them, offer no reasons for treating such swaps as rendering long parties subject to Sections 13 and 16 based on shares purchased by another party as a hedge. Absent some reasoned direction from the SEC, there is neither need nor reason for a court to do so.

. Information that must be disclosed under Section 13(d) includes: (1) the background, identity, residence and citizenship of the purchaser; (2) the name of the issuer, class of securities and aggregate amount purchased or to be purchased; (3) the source and amount of funds or other consideration used or to be used in making the purchase; and (4) the purpose of the acquisition. See 15 U.S.C. § 78m(d)(l); 17 C.F.R. § 240.13d-101.

. See, e.g., CSX Corp. v. Children’s Inv. Fund Mgmt. (UK) LLP, 562 F.Supp.2d 511, 540 (S.D.N.Y.2008) (suggesting that in establishing its regulations under Section 13(d), the SEC sought “to cast a very broad net to capture all situations in which the marketplace should be alerted to circumstances that might result in a change in corporate control'').

. I note that this Rule states only that Section 13(d) standards govern the definition of beneficial owner under Section 16. However, this does not mean that Section 16 does not inform the interpretation of "beneficial owner” under Section 13(d). That term was used first in Section 16 in 1934, and when Congress adopted it for use in Section 13(d) in 1968, there was no indication that a different meaning was intended or that the canon of statutory construction requiring harmonization was not to apply.

. The Supreme Court noted that the SEC had filed a brief as amicus curiae arguing that the proper interpretation of the 1934 Act would require disgorgement of the profits. Reliance Elec., 404 U.S. at 425-26, 92 S.Ct. 596. The Court explicitly rejected the SEC's proposed construction of the 1934 Act. Id. at 426-27, 92 S.Ct. 596.

. Critics who believe the Williams Act’s provisions are too lenient have, as a result, unsuccessfully sought to shorten the time before disclosure is required. One of the most visible efforts was the Tender Offer Disclosure and Fairness Act of 1987, which would have reduced the Section 13(d) reporting deadline from ten days to five days. See Report of the Senate Committee on Banking, Housing and Urban Affairs on the Tender Offer Disclosure and Fairness Act of 1987, S.Rep. No. 100-265, at 19 (1987). Senator William Proxmire, the bill’s sponsor, described the motivation behind that proposal:
During the ensuing 10 days, the company’s shareholders are kept in the dark. The general investor knows nothing about this acquisition. Meanwhile, in that 10-day period, the acquirer knows, the arbitragers know, the people who are working with him know about the deal. They are the insiders. They can move swiftly; they can move invisibly. They may acquire working control of the corporation without the knowledge of the overwhelming majority of shareholders or the management. Icahn grabbed 20 percent of TWA before the 10-day window closed.
134 Cong. Rec. S8224-01 (June 20, 1988) (statement of Sen. Proxmire) (paragraph break omitted).
Senator Paul Sarbanes, a co-sponsor of Proxmire’s bill, echoed this concern:
Under current law, any person who acquires more than 5 percent of a company’s stock need not file a disclosure statement of having done that until 10 days after the acquisition that exceeds the 5-percent threshold. This has permitted stock acquisitions much greater than 5 percent during the 10-day window period before any disclosure is required.... As a result, by the time the first disclosure is made, a person may have accumulated a very significant interest in excess of 5 percent in the company-
In fact, in some instances, they may even have secured a controlling interest in the company, particularly if you define "controlling” as being a much smaller figure than a majority interest, since a person holding a very large interest, with everyone else holding a very small interest, is perceived as controlling, even though they are short of majority control.
Id. (statement of Sen. Sarbanes).
Senator Paul Simon unsuccessfully introduced a bill that would have been even more restrictive than Proxmire’s, proposing that disclosure be required after only two days, and lowering the ownership threshold from 5 percent to 2 percent. See Richard Greenfield, Merger Mania: Don’t Blame “Raiders” for Systemwide Abuses, Legal Times, Apr. 4, 1988, at 16.

. The 2000 Amendment added Section 3A to the 1934 Act, which reads:
§ 78c-l. Swap Agreements
(a) Non-security-based swap agreement The definition of “security'' in section 78c(a)(10) of this title does not include any non-security-based swap agreement (as defined in section 206C of the Gramm-Leach-Bliley Act).
(b) Security-based swap agreements
(1) The definition of "security” in section 78c(a)(10) of this title does not include any security-based swap agreement (as defined in section 206B of the GrammLeach-Bliley Act).
(2) The Commission is prohibited from registering, or requiring, recommending, or suggesting, the registration under this chapter of any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act). If the Commission becomes aware that a registrant has filed a registration application with respect to such a swap agreement, the Commission shall promptly so notify the registrant. Any such registration with respect to such a swap agreement shall be void and of no force or effect.
(3) Except as provided in section 78p(a) of this title with respect to reporting requirements, the Commission is prohibited from—
(A) promulgating, interpreting, or enforcing rules; or
(B) issuing orders of general applicability;
under this chapter in a manner that imposes or specifies reporting or record-keeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading with respect to any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act).
(4) References in this chapter to the "purchase” or "sale” of a security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) shall be deemed to mean the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap agreement, as the context may require.
15 U.S.C. § 78c-l (as codified).
*295 The Funds argue that Section 3A(b)(2), 15 U.S.C. § 78c-l(b)(2), prohibits the SEC from treating long parties as “beneficial owners” of shares purchased as hedges by short parties. Given the 2010 amendments discussed in the next paragraph of the text, it is a moot question whether the SEC Rules discussed infra would be beyond its powers if deemed at the time of the district court opinion to render long parties beneficial owners of shares purchased as a hedge by short parties.

. Section 16 does not mention equity-based swaps in its definition of persons who are 10 percent beneficial owners subject to Section 16’s reporting and disgorgement provisions, 15 U.S.C. § 78p(a)(l), but does require that those beneficial owners disclose purchases and sales of "security-based swap agreement[s]” as well as "equity securities],” and that they disgorge profits from short-swing sales of both. 15 U.S.C. §§ 78p(a)(2)(C), 78p(b); see also Giovanni P. Prezioso, Broker-Dealer Regulation: The Commodity Futures Modernization Act of 2000 (American Law Institute — American Bar Association Continuing Legal Education, cosponsored by the Federal Bar Association, January 10-11, 2002). The reason Section 16 omitted security-based swap agreements in determining the 10 percent ownership trigger was that its animating concern is trading and profiting by investors with access to nonpublic material information. While actual ownership of shares carries with it voting rights, and therefore power in many cases to obtain such information, security-based swap agreements, without provisions requiring acquisition, disposition, or voting of hedge shares, do not vest the long party with such voting rights and are thus irrelevant to the criteria for crossing the 10 percent ownership threshold. For investors who do meet Section 16’s definition of a 10 percent owner, however, security-based swap agreements offer an opportunity to profit from trading on non-public material information. As a result, subjecting swaps to Section 16’s reporting and disgorgement provisions was deemed appropriate even though such swaps were excluded from that section's definitional trigger. Given the Dodd-Frank amendment discussed immediately hereafter in the text, the SEC now has power to include holders of all security-based swaps within the term "beneficial owner.”

. Representatives of TCI, in negotiating with CSX and elsewhere, occasionally referred to the swaps as vesting ownership of CSX shares. Of course, when TCI sought control, its unwinding of swaps and purchasing of shares contradicted these assertions. Moreover, beneficial ownership is a legal question and such remarks, which add nothing to TCI's rights under the swaps, do not bind a court addressing that legal question. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); Hankins v. Lyght, 441 F.3d 96, 104-05 (2d Cir.2006) (stating that a court is required to interpret federal statutes as they are written, and is not bound by parties' stipulations of law).
It would be quite anomalous to hold that a swap-holder who makes such a remark is a beneficial owner of the hedge shares while an identical swap-holder who makes no such statement is not such an owner. Such a rule would, moreover, potentially cause repetitive litigation by creating triable issues based on oral statements in eveiy Section 13(d) case involving swaps. Cf. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 743, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (expressing concern that "holder” claims would "throw open to the trier of fact many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony”).
Finally, as discussed infra, TCI's swaps would allow it to profit if it caused a change in CSX’s business plan that increased the value of the company without a control struggle. The remarks in question may well have been an exaggerated description of that potential benefit.

. In the context of swaps, reading "influence” in an unlimited manner would have anomalous consequences. Even in the exceptional case where the short party does not hedge with actual shares, a long party would bear the risk of being found to have "influenc[ed]” the purchase of shares by another unknown party further down the line in the chain of transactions. For example, the short party might hedge its position by entering into a separate swap position with a third party, which, in turn, hedges its own position. Like the initial short party, the third party might purchase actual shares as a hedge or enter into an additional swap agreement or similar derivative position with an additional party, and so on. The initial long party may have no knowledge of the identity or action of the party that ultimately purchases actual shares as a hedge. Moreover, the ultimate share purchaser may have interests in the shares that are in direct opposition to the interests of the initial long party.
Consider, for example, the swap transactions at issue in the 2006 failed buyout offer of Sears Canada by Sears Holding. See In re Sears Canada Inc., et al., 2006 CarswellOnt 6994 (Ont.Secs.Comm. Aug. 8, 2006), off d In re Sears Canada, et at, 2006 CarswellOnt 6272 (Ont.Div.Ct. Oct. 11, 2006). Prior to the buyout announcement, hedge fund Pershing Square, L.P. ("Pershing”) held an equity position of 5.3 million shares in Sears Canada. Id. ¶ 22. To avoid unfavorable tax consequences relating to a dividend payment by Sears Canada, Pershing, still prior to the buyout announcement, converted its Sears Canada holdings to a derivative position by selling all its shares in connection with entering cash-settled equity swap agreements with SunTrust Capital Markets, Inc. ("SunTrust”). Id. ¶ 22. To hedge its swap agreement with Pershing, SunTrust entered its own swap arrangements with Bank of Nova Scotia ("BNS”) and Scotia Capital Markets Group, a BNS subsidiary. Id. ¶¶ 20, 103, 159. In the process, SunTrust arranged the sale of Pershing's Sears Canada shares to BNS. Id. ¶¶ 20, 103. For its part, BNS hedged its swap position with SunTrust by purchasing shares of Sears Canada stock and entering additional offsetting swap agreements. Id. ¶¶ 159, 221.
At the time it entered into its swap agreement with SunTrust, Pershing had no knowledge of which party ultimately purchased its Sears Canada shares, nor did BNS, the purchaser of Pershing’s Sears Canada shares, know who had sold them. Id. ¶¶ 59, 103. Ultimately, BNS’s interest in its Sears Canada shares was in direct opposition to the interests of Pershing, as evidenced by BNS voting *299 its shares in favor of the buyout offer while Pershing opposed the offer as inadequate. Id. ¶ 52. Nevertheless, one can argue that Pershing, by entering its swap agreement with Sun-Trust, "influence[d]” the purchase of Sears Canada shares by BNS.

. In analyzing “material facilitation” purely in terms of the effect of swap transactions on the ability to purchase shares, I am simply addressing the argument that CSX has raised before us. As I discuss, infra, persons may choose to acquire long equity swap positions for reasons other than acquiring shares when the swap positions unwind.

. If markets are highly illiquid, then purchasing shares to hedge short swap positions will most likely either be impossible or prohibitively expensive. Moreover, the frequent absence of a market price in a highly illiquid market is likely to discourage the creation of standard equity swap agreements for lack of an objective means of calculating the cash flows required by changes in the referenced asset’s value. Under such circumstances, a bank would enter into a short swap position only if it were willing either to accept the risks of an unhedged short exposure or to hedge its short exposure by some means other than purchasing shares. (Of course, a bank might simply refuse to enter such an agreement at all, in light of the hedging difficulties.) In any case, acquisition of large quantities of hedge shares by a short swap counterparty in such a market would be highly unlikely. Moreover, because a highly illiquid market is typically one in which the vast majority of shares are held by only a small number of owners, takeovers via the medium of cash tender offers in the open market — the core concern of the Williams Act — are likely to be rare anyway.

. As my discussion of the formation of a "group” indicates, see infra, if the long party has an agreement with the short party as to the voting of shares purchased as a hedge, the shareholdings of both parties would be aggregated for purposes of tallying, the percentage of shares held by beneficial owners.

. For example, each of former Rules 146, 240 and 242, which provided registration exemptions for, inter alia, privately placed securities, included a preliminary note stating that technical compliance with the rule would not assure the exemption if the securities transaction was "part of a plan or scheme to evade the registration requirements of the Act.” See Notice of Adoption of Rule 146, Securities Act Release No. 5487, 1974 WL 161966, *5 (April 23, 1974); Notice of Adoption of Rule 240, Securities Act Release No. 5560, 1975 WL 160968, *3 (Jan. 24, 1975); and Exemption of Limited Offers and Sales by Qualified Issuers, Securities Act Release No. 6180, 1980 WL 29335, *13 (Jan. 17, 1980).
Evasion provisions remain prevalent in the SEC's current rules and regulations. Regulation D, which, among other things, replaced Rules 146, 240 and 242, see Revision of Certain Exemptions from Registration, Securities Act Release No. 6389, 47 Fed.Reg. 11,251-01 (Mar. 16, 1982), includes an evasion provision stating that “regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with these rules, is part of a plan or scheme to evade the registration provisions of the Act.” 17 C.F.R. §§ 230.501-.508 n. 6. A nearly identical evasion provision appears in each of current Rule 144, 17 C.F.R. § 230.144 n. 2 (exempting registration for sales of restricted or control securities), Rule 144A, 17 C.F.R. § 230.144A n. 3 (exempting registration for sales to Qualified Institutional Buyers), Rule 147, 17 C.F.R. § 230.147 n. 3 (exempting registration for intra-state issuances), Regulation S, 17 C.F.R. §§ 230.901-.904 n. 2 (exempting registration for offers and sales outside the United States), and Rule 701, 17 C.F.R. § 230.701 n. 5 (exempting from regis *303 tration sales of securities pursuant to employment compensation plans).
Rule 10b5~l(c) provides an affirmative defense to insider trading charges for trades made pursuant to written plans for the sale of securities by corporate insiders who may have material nonpublic information. 17 C.F.R. § 240.10b5 — l(c)(l)(i). However, the affirmative defense is available only when the plan to purchase or sell securities was "given or entered into in good faith and not as part of a plan or scheme to evade prohibitions of this section.” 17 C.F.R. § 240.10b5-l(c)(l)(ii). Other rules with evasion provisions include Rule 1 Ob-18, 17 C.F.R. § 240.1 Ob-18 n. 1 (exempting certain issuer repurchases from market manipulation rules), Rule 167, 17 C.F.R. § 230.167 note (exempting certain communications in connection with asset backed securities from dissemination restrictions under Sections 5(c) and 2(a)(10)), and Rule 168, 17 C.F.R. § 230.168 n. 1 (exempting forward looking and factual business information from the dissemination restrictions under Sections 5(c) and 2(a)(10) of the Act).

. Arrangements to line up financing for stock acquisitions might trigger Section 13(d)'s “group” provisions with respect to the lender and the borrower, depending upon the specific circumstances and conditions of the financing. See, e.g., Roth v. Jennings, 489 F.3d 499, 502, 511-13 (2d Cir.2007) (holding that dismissal of a Section 16 suit for dis *304 gorgement of short-swing profits was unjustified when there were allegations that a loan had been made to a borrower in furtherance of an agreement between the lender and the borrower "to work together to effect a change of control or similar transaction involving [the company whose shares were purchased with the borrowed money]”) (internal quotation marks omitted).

. I do not disagree with the district court’s analysis. I note, however, that a long party has no interest in putting a short party under a Section 13(d) disclosure obligation. Such disclosure is costly to the short party, and the costs will be passed on to the long party.

. Because my reasoning does not rely on the creation of a false appearance, I do not reach the role of such conduct under Rule 13 d — 3(b).

. This application of Section 13(d)'s "group” provisions to equity swaps was not precluded at the time of the district court’s decision by Section 3A’s general prohibition of most SEC regulation of security-based swaps. The pertinent part of Section 3A, 15 U.S.C. 78c-l(b), explicitly adopts the definition of "security-based swap agreement” provided by Section 206B of the Gramm-Leach-Bliley Act, which in turn incorporates the definition of "swap agreement” provided by Section 206A of that Act. 15 U.S.C. §§ 78c-l(b), 78c note. Section 206A's definition explicitly excludes:
(1) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof;
(3) any agreement, contract, or transaction providing for the purchase or sale, of one or more securities on a fixed basis;
(4) any agreement, contract, or transaction providing for the purchase or sale of one or more securities on a contingent basis, unless such agreement, contract, or transaction predicates such purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction....
15 U.S.C. § 78c note; see also Giovanni P. Prezioso, Broker-Dealer Regulation: The Commodity Futures Modernization Act of 2000 (American Law Institute — American Bar Association Continuing Legal Education, cosponsored by the Federal Bar Association, January 10-11, 2002). As I noted supra, the economic position of a party to a cash-settled equity swap is identical to the economic position of a party to an equity swap that is settled in kind. The latter, however, gives the long swap party an additional right, not shared by the rest of the market, to acquire directly from the short party the shares referenced by the equity swap. Such extra agreements concerning purchases and sales clearly bring in-kind-settled equity swap agreements under the Section 206A exclusion from Section 3A’s prohibition on SEC regulation. Likewise, an agreement between the long and short swap parties about the voting of hedge shares is not itself properly characterized as a swap agreement, as Section 206A defines that term, and therefore Section 3A places no obstacle in the way of finding that such a voting agreement can create a "group” for purposes of Section 13(d).

. With respect to a group involving both long and short parties, the district court noted that TCI had communications with Deutsche Bank and with one of Deutsche Bank’s hedge funds, Austin Friars, which held a substantial amount of CSX stock. CSX Corp., 562 F.Supp.2d at 530. The court noted that these communications (in 2008) might be sufficient to create a group under Rule 13d-5(b)(l), 17 C.F.R. § 240.13d-5(b)(l), but did not resolve the question. Id. at 543-45.
However, with this one exception, there is no evidence that the Funds had any understanding with any of the banks regarding the purchase of CSX shares, the sale of such shares to the Funds when the swaps were unwound, or the voting of such shares.